Docket No. 23-12346

# United States Court of Appeals
# Eleventh Circuit

**Fama Construction, LLC,**

*Petitioner,*

v.

**Secretary of Labor,**
**United States Department Of Labor,**

*Respondent.*

### Review of an Order of the
### Occupational Health and Safety Review Commission

**BRIEF FOR THE PETITIONER**

Andrew N. Gross
ANDREW N. GROSS, LLC
*Attorney for Petitioner*
Suite 100
1201 Peachtree Street, NE
Atlanta, Georgia 30361

Fama Construction, LLC v. Secretary of Labor                    No. 23-12346

## I. CERTIFICATE OF INTERESTED PERSONS

The judges, attorneys, persons, associations of persons, firms, partnerships or corporations having an interest in this appeal are:

Andrew N. Gross, LLC

Betts, Louise M.

Fama Construction, LLC

Gatto, John, ALJ

Gross, Andrew N.

Occupational Safety and Health Administration

Occupational Safety and Health Review Commission

Phillips, Heather R.

Tryon, Amy

United States Department of Labor

## II. CORPORATE DISCLOSURE STATEMENT

Petitioner Fama Construction, LLC states that it has no corporate parents or subsidiaries, and no publicly traded corporation is involved.

## III. STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested. The decisional process would be aided by oral argument examining the history and legitimacy of OSHA's multiemployer policy, and the Agency's arbitrary enforcement process. Clear rules are necessary to determine which employers involved in construction projects are candidates for enforcement, as well as clear notice to employers of the parameters of those rules.

Allowing OSHA to arbitrarily impose penalties on a subcontractor with no onsite presence, and in no position to enforce worker safety while ignoring the employer actually responsible for worker safety does not result in safer workplaces.

OSHA gains a pyrrhic victory if a mid tier project subcontractor that can't afford the penalty is driven out of business. The labor subcontractors who hired and supervised the workers, and were in the best, if not the only position to enforce safety, suffer no consequence. They move on to peddle their labor contract services at other roofing where they continue their unsafe practices.

## IV. CERTIFICATE OF TYPE SIZE STYLE AND VOLUME

This brief complies with type-volume limitations of Fed.R.App.P. 32(a)(7)(B), the requirements of Fed.R.App.P. 32(a)(5), and the requirements of Fed.R.App.P. 32(a)(6). It has been prepared in Book Antiqua 13 point, a proportionally spaced typeface using WordPerfect, and contains 5,966 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

1

# V. TABLE OF CONTENTS

I. CERTIFICATE OF INTERESTED PERSONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

II. CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

III. STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . 1

IV. CERTIFICATE OF TYPE SIZE STYLE AND VOLUME . . . . . . . . . . . . . . . . . . 1

V. TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

VI. TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

VII. STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

VIII. STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IX. STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   B.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   C.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

X. SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

XI. ARGUMENT AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . . . . . . 12

   A.    OSHA's Interpretation of 29 U.S.C. 654(a)(2) in its
         Multiemployer Citation Policy Is Unconstitutionally
         Vague and Unreasonable, an Invalid Interpretation of
         29 U.S.C. §654(a)(2), Impermissible Agency Rulemaking
         or an Unpromulgated Legislative Rule. . . . . . . . . . . . . . . . . . . . . 12

   B.    OSHA's Definition of Controlling Party in its Multiemployer
         Citation Policy Is Unconstitutionally Vague and Unreasonable,
         an Invalid Interpretation of 29 U.S.C. §654(a)(2), an
         Impermissible Agency Rulemaking or an Unpromulgated
         Legislative Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. The Multiemployer Citation Policy Definition of Controlling Employer Is Vague. . . . . . . . . . . . . . . . . . . . . . . 16

2. OSHA's Selective Enforcement of its Multiemployer Citation Policy Is Arbitrary and Unreasonable. . . . . . . . . . . . 18

C. Application of OSHA's Multiemployer Policy Should Be Limited to General or Other Contractors with Actual Onsite Control over the Jobsite, and Not Applicable to Mid-Tier Subcontractors Lacking Actual Onsite Control over the Jobsite. . . . 20

D. The Review Commission's Findings That Fama Failed to Support its Economic Infeasibility Claim Was Arbitrary and Contrary to Established Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1. The ALJ Wrongly Determined That Fama Failed to Offer Proof of a Feasible Alternative Means of Protection. . . 26

2. Contrary to the ALJ Finding, Fama Did Offer Evidence of Proof Concerning the Second Element of its Case . . . . . . . 28

E. The Review Commission Findings That Fama Can Be Held Responsible for the Violative Conditions at the Worksites Are Not Supported by Substantial Evidence. . . . . . . . . . . . . . . . . . . . 29

1. Nothing in Fama's Relationship to its Labor Subcontractors Establishes the Level of Control Required to Classify it as a Controlling Employer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2. The Labor Subcontract Gave Fama No Specific Rights To Control Safety. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3. The Cost to Fama of Complying with OSHA's Demands Are Economically Infeasible. .. . . . . . . . . . . . . . . . . 31

XII. CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3

## VI. TABLE OF CITATIONS

**Cases**

*Acosta v. Hensel Phelps Constr. Co.,* 909 F.3d 723, 731 (5th Cir. 2018). . . . . . . . . 12, 14

*Anning-Johnson,* 4 BNA OSHC 1193 (No. 3694, 1976). . . . . . . . . . . . . . . . . . . . . . . . 21

*Centex-Rooney* 16 BNA OSHC 2127 (No. 92-0851, 1994) . . . . . . . . . . . . . . . . . . . . . 21

*Centimark Corp.,* No. 20-0762, 2023 WL 2783505, (OSHC Mar. 29, 2023). . . . . . . . . 26

*Color Pigments Mfrs. Ass'n, Inc. v. Occupational Safety & Health Admin,* 16 F.3d 1157 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Comtran Group, Inc. v. U.S. Dep't of Labor,* 722 F.3d 1304 (11th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*David Weekley Homes,* 19 BNA OSHC 1116, 1119 (No. 96-0898, 2000) . . . . . . . . . 23

*Daniel International Corporation v. Occupational Safety and Health Review Commission,* 683 F.2d 361 (11th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . 10

*Evergreen Constr. Co.,* 26 BNA OSHC 1615 (No. 12-2385, 2017). . . . . . . . . . . . . 17, 18

*Fama Constr. v. U.S. Dept of Labor,* 19-13277 (11th Cir. Jun 30, 2022) . . . . . . . . . . . 14

*Georgia Pacific Corp. v. OSHRC,* 25 F.3d 999, 1003-04 (11th Cir. 1994). . . . . 12, 16, 19

*Gil Haugan d/b/a Haugan Constr. Co.,* 7 BNA OSHC 2004 (No. 76-1512, 1979). . . . 21

*Grossman Steel,* 4 BNA OSHC 1185 (No. 12775, 1976). . . . . . . . . . . . . . . . . . . . . . . . 21

*Harry C. Crooker & Sons, Inc. v. Occupational Safety & Health Review Comm'n,* 537 F.3d 79, 82 (1st Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*IBP, Inc. v. Herman,* 144 F.3d 861 (D.C. Cir. 1998). . . . . . . . . . . . 17, 18, 20, 23, 24, 31

*M.C. Dean, Inc. v. Sec'y of Labor,* 505 Fed.Appx. 929 (11th Cir. 2013). . . 24, 26, 27, 32

*McDevitt Street Bovis, Inc.,* 19 BNA OSHC 1108 (OSHRC 97-1918, 2000). . . . . . . . 21

*NDC Construction Co. v. Sec. of Labor,* No. 20-14484, 2022 WL 2373402 (11th Cir. June 30, 2022)*; NDC Construction Company,* OSHA Docket No. 17-1689, 2020 . . . 22

*Stormforce of Jacksonville, LLC,* OSHA Docket No. 19-0593, 2021. . . . . . . . . . . . . . 22

*Summit Contractors Inc.,* 22 BNA OSHC 1777, 1781 (No. 03-1622, 2009). . . . . . 21, 29

**Statutes, Regulations, and Rules**

5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. §654(a)(2). . . . . 12, 14

5 U.S.C. §551(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

OSHA, Instruction CPL 2.49, Multiemployer Citation Policy (Dec. 23, 1981). 13, 15

OSHA Directive CPL 2-0.124 Multiemployer Policy (Dec. 10, 1999).. . . . . 12, 13, 15

## VII. STATEMENT OF JURISDICTION

This Court has jurisdiction over timely petitions for review of a final order of the Occupational Safety and Health Review Commission, including denial of review, pursuant to 29 U.S.C. §660(a).

## VIII. STATEMENT OF THE ISSUES

1. Whether OSHA's interpretation of 29 U.S.C. 654(a)(2) in its multiemployer citation policy is unconstitutionally vague and unreasonable, an invalid interpretation of 29 U.S.C. §654(a)(2), impermissible agency rulemaking or an unpromulgated legislative rule.

2. Whether OSHA's definition of controlling party in its multiemployer citation policy is unconstitutionally vague and unreasonable, an invalid interpretation of 29 U.S.C. §654(a)(2), an impermissible agency rulemaking or an unpromulgated legislative rule.

3. Whether application of OSHA's multiemployer policy should be limited to general contractors with actual onsite control over the jobsite, and not to mid tier subcontractors lacking actual onsite control over the jobsite.

4. Whether Review Commission findings that Fama failed to support its economic infeasibility claim was arbitrary and contrary to established law.

5. Whether Review Commission findings that Fama is responsible for the violative conditions at the worksites are supported by substantial evidence.

6

## IX. STATEMENT OF THE CASE

### A.    Introduction

This is a Petition for Review of an unfavorable decision of an administrative law judge ("*ALJ*") on summary judgment that resulted from the Contest of several proposed Citations issued by OSHA during Inspections at a construction jobsite. The ALJ concluded that Fama was liable as a controlling employer of the work crews.

Fama Construction sought and obtained discretionary review of the ALJ decision before the Occupational Safety and Health Review Commission. Upon its review, the Commission first determined that Fama was a controlling employer under OSHA's multi-employer worksite doctrine, but then set aside the judge's decision because it was not based on Fama's liability as a controlling employer. Commission Remand Order at 3-4. The ALJ had held Fama to the more stringent standard required of an employer whose own employees are exposed to the alleged violative conditions rather than the more limited standard obliging a controlling employer to only take "reasonable measures" to protect the exposed employees of another employer. *Id*. The Commission found that the judge failed to analyze Fama's liability under the correct legal framework. *Id*. The matter was remanded for further proceedings to determine Fama's controlling employer liability under the proper standard.

The Commission also found that the ALJ improperly granted summary

judgment to the Secretary on Fama's affirmative defense of economic infeasibility, holding that the burden was not, as the ALJ had ruled, on Farna to establish material facts supporting its economic infeasibility claim. Rather, the burden was on the Secretary as the moving party to establish that there were none. *Id* at 4-5.

Upon remand, the ALJ once again granted summary judgment on Fama's liability as a controlling employer and the economic infeasibility claim. Fama again sought discretionary review, but the matter was not selected again for review, thereby resulting in the Final Order of the Commission on which this Petition is based.

**B.    Statement of Facts**

An OSHA Compliance Officer noted and cited a jobsite in a residential subdivision where workers engaged in roofing lacked fall protection, and did not appear to be adequately using personal protective equipment. OSHA issued citations to Fama alleging three violations of various construction standards for a cumulative penalty of $153,778: Citation 1: Item 1 alleged violation of 29 C.F.R. §20(b)(2) failure to initiate and maintain programs for frequent and regular inspections of the jobsite, classified Serious with $13,127 proposed penalty; Citation 1: Item 2 alleged violation of 29 C.F.R. §100(a) employees working in areas with a possible danger of head injuries from falling or flying objects, classified as Serious with $9,377 proposed penalty; and Citation 2: Item 1 alleged violation of 29 C.F.R.

§501(b)(13) employees working above lower levels not protected by fall protection systems, classified as Repeat with $131,274 proposed penalty.

Fama Construction, LLC is a subcontractor that bids for and obtains roofing labor and materials jobs from homebuilder contractors. Fama subs out the entire labor portion of the contract to roofing labor subcontractors. When it has a job available, Fama contacts a labor subcontractor, and provides a description and pictures of the job, and offers a fixed price per job based on the square footage of the roof. The labor subcontractor either accepts or declines Fama's offer. If the labor subcontractor declines an offer, Fama contacts another labor subcontractor, continuing the offer process until a labor subcontractor accepts the offer.

For each job, Fama orders the materials and arranges for them to be delivered to the jobsite. The labor subcontractor supplies its own tools and equipment for the job. The labor subcontractor, not Fama, decides how many workers it needs to complete the job, selects and hires them, supervises their work, and determines the work schedule.

No Fama employees work at the jobsite either as laborers or supervisors. Roofing work crews of the labor subcontrators have often violated Occupational Safety and Health Act regulations, but with no Fama personnel on site, Fama does not observe the safety violations when they occur.

There is no record of OSHA citing the labor subcontractor employers at the

9

jobsite who hired and actually supervised the workers. Nor was the general contractor homebuilder cited. It appears that Fama alone was cited.

## C.    Standard of Review

Commission findings and conclusions of fact are upheld if supported by substantial evidence on the record considered as a whole. *Daniel International Corporation v. Occupational Safety and Health Review Commission*, 683 F.2d 361 (11th Cir. 1982).

The Commission's legal conclusions are reviewed by appellate courts as to whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Comtran Group, Inc. v. U.S. Department of Labor*, 722 F.3d 1304, 1307 (11th Cir. 2013).

The Review Commission and its administrative law judges are bound to follow the law of the circuit to which a case would likely be appealed. *Interstate Brands Corp.,* 20 BNA OSHC 1102, 1104 n.7 (No. 00-1077, 2003).

## X. SUMMARY OF ARGUMENT

The finding that Fama was liable as a controlling employer is wrong as a matter of law because OSHA's multiemployer citation policy is void or not applicable. OSHA's interpretation of 29 U.S.C. 654(a)(2) in its multiemployer citation policy is unconstitutionally vague and unreasonable, an invalid interpretation of the law, impermissible agency rulemaking or an unpromulgated legislative rule.

The multiemployer citation policy definition of controlling employer is also vague, and OSHA's selective enforcement of its policy is unreasonable. Application of OSHA's multiemployer policy should be limited to general or other contractors with actual onsite control over the jobsite, and not applicable to mid-tier subcontractors lacking actual onsite control over the jobsite.

Even if Fama could have been cited as a controlling employer, the multiemployer policy imposes a lesser burden than imposed on exposing employers. A controlling employer need not inspect for hazards as frequently, or have the same level of knowledge of the applicable standards or of trade expertise as its labor subcontractor. Serving exclusively as a broker matching its pool of labor subcontractors to available projects, and only rarely visiting worksites to assess completion and quality control, Fama had no supervisory authority over the actual work, and therefore no effective power to enforce workplace safety.

The Review Commission's findings that Fama failed to support its economic infeasibility claim was arbitrary and contrary to law. The ALJ wrongly determined that Fama failed to offer proof of a feasible alternative means of protection. Contrary to the ALJ finding, Fama did offer evidence of the required elements of its case.

Finally, the Review Commission findings that Fama can be held responsible for the violative conditions at the worksites are not supported by substantial evidence.

11

## XI. ARGUMENT AND CITATIONS OF AUTHORITY

**A.** **OSHA's Interpretation of 29 U.S.C. 654(a)(2) in its Multiemployer Citation Policy Is Unconstitutionally Vague and Unreasonable, an Invalid Interpretation of 29 U.S.C. §654(a)(2), Impermissible Agency Rulemaking or an Unpromulgated Legislative Rule.**

29 U.S.C. §654, OSHA's enabling statute, requires employers to follow OSHA's workplace safety rules. *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 731 (5th Cir. 2018). The statute and the standards comprising its applicable regulations are intended to protect workers with on-the-job safety and health requirements.

For worksites with more than one employer, OSHA has adopted a multiemployer citation policy [CPL 2-0.124, Multi-employer Citation Policy (Dec. 10, 1999)] that "provides guidance to OSHA inspectors as to when it may be appropriate to cite a particular employer" for a violation of an OSHA safety standard. *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 737 (5th Cir. 2018). OSHA's multiemployer citation policy is not a statute or a regulation, nor is it expressly authorized by any statute or regulation. It is merely OSHA's interpretation of its enforcement authority pursuant to 29 U.S.C. §654(a)(2).

OSHA's interpretation is subject to judicial review, and where either unreasonable or unconstitutionally vague as applied, it should not be enforced. *Georgia Pacific Corp. v. OSHRC*, 25 F.3d 999, 1003-04 (11th Cir. 1994). ("where the Secretary's interpretation of a regulation is either unconstitutionally vague as applied or

12

unreasonable given the regulated activity, we may refuse to accept the Secretary's interpretation.")

The initial OSHA multiemployer citation policy definition of controlling employer was promulgated in 1981 following notice and comment as required by the Administrative Procedure Act ("*A.P.A.*"). OSHA, Instruction CPL 2.49, Multi-Employer Citation Policy (Dec. 23, 1981). Reference to the "controlling employer" meant "the employer who is in the best position to correct the hazard or assure its correction."

The policy definition of controlling employer has been expanded since 1981. OSHA's current policy defines "controlling employer" as an "employer who has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them. CPL 02-00-124 - CPL 2-0.124 - Multi-Employer Citation Policy (Dec. 10, 1999) at ¶17. Control can be established by contract or, in the absence of explicit contractual provisions, by the exercise of control in practice." *Id.* These changes to the initial multiemployer policy were adopted without the A.P.A. required notice and comment. The changes are therefore procedurally invalid because agencies must use the same procedures to amend a rule as were applied to issue the initial rule. 5 U.S.C. §551(5). Even if the later interpretations are arguably reasonable, they must still be rejected because they are procedurally defective.

13

**B.  OSHA's Definition of Controlling Party in its Multiemployer
Citation Policy Is Unconstitutionally Vague and Unreasonable,
an Invalid Interpretation of 29 U.S.C. §654(a)(2), an Impermissible
Agency Rulemaking or an Unpromulgated Legislative Rule.**

OSHA's multiemployer citation policy defines four categories of employers
who might be liable for citation. Three of these categories are clearly defined, and
there has been little dispute about their applicability. They include the "creating
employer" who caused a hazardous condition, the "exposing employer" whose
employees were exposed to the hazard, and the "correcting employer" engaged in
a common undertaking with the exposing employer on the same worksite, and who
is responsible for correcting the hazard. [Multiemployer Policy at ¶¶14-16]. The
policy's fourth category, the "controlling employer", is not clearly defined, and is
often disputed.

It is now well settled that the Secretary of Labor has the authority under
Section 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. §654(a)(2), to
issue citations to controlling employers at multiemployer worksites for violations
of the Act's standards. *See, e.g., Fama Constr. v. U.S. Dept of Labor*, 19-13277 (11th Cir.
Jun 30, 2022) *citing Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 743 (5th Cir.
2018). But who are those controlling employers subject to enforcement pursuant to
29 U.S.C. §654(a)(2)?

The earliest iterations of the Multiemployer Policy, promulgated upon A.P.A.

14

required notice and comment, defined "controlling employer" as "the employer who is in the *best* position to correct the hazard or assure its correction." 5 OSHA, Instruction CPL 2.49, Multi-Employer Citation Policy (Dec. 23, 1981) [emphasis added]. There have been subsequent modifications to this definition since 1981, but as discussed in Section XI.A., *supra*, the modifications are invalid because they lack the A.P.A. required notice and comment.

OSHA's current policy defines controlling employer as an "employer who has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them." CPL 2-0.124, Multi-employer Citation Policy (Dec. 10, 1999). In the construction industry, in addition to issuing citations to the logical targets such as the creating or exposing employer, the multiemployer policy is often enforced against general contractors. General contractors are almost always controlling employers by virtue of their supervisory capacity and direct on site presence and control over all construction. Almost all case law holding employers liable under the multiemployer policy specifically involve general contractors determined to have been liable as controlling employers.

While OSHA has authority under the statute to issue citations to controlling employers, the enabling statute does not grant OSHA unfettered discretion for inconsistent enforcement free of judicial scrutiny. Since OSHA's basis for deciding

15

who is a controlling employer subject to citation is derived from its multiemployer citation policy, that policy must satisfy the procedural requirements of the A.P.A. OSHA's multiemployer citation policy fails A.P.A. compliance because it is both vague in its definition of controlling employers subject to citation, and unreasonable in its arbitrary and selective enforcement application amongst employers.

1.    *The Multiemployer Citation Policy Definition*
      *of Controlling Employer Is Vague*

Where a critical term or phrase such as controlling employer is not clearly defined, the regulation is unconstitutionally vague as applied for failing to give sufficient guidance to those who are subject to civil penalties. *Georgia Pacific Corp. v. OSHRC,* 25 F.3d 999, 1005-1006 (11th Cir. 1994). Obligations imposed on employers must be reasonable and clear, as well as easily understood and applied. *Id.*

OSHA's current policy further defines control ambiguously to include control specifically stated in the terms of a contract with a lower tier subcontractor, or in the absence of explicit contract terms, by the exercise of control in practice. The Secretary contends here that Fama's contract with the labor subcontractor empowered it to enforce fall protection, either by itself, or by pressuring the labor subcontractor. But contending that Fama's contract rights require it to discipline its subcontractor's employees takes "the meaning of control to an unacceptably high level of abstraction"; "something like control, once removed", where the Secretary

16

has arbitrarily concluded that the evidence supports a finding of control. *See IBP, Inc. v. Herman*, 144 F.3d 861, 867. Under this reading of the current multiemployer policy, an employer could not limit its OSHA liability by contract if it remained implicated in any manner relative to safety policies or training. *Id.*

The contractual control principle articulated in the multiemployer policy as claimed by the Secretary effectively reduces a mid tier subcontractor's incentive to advance workplace safety. Rather than cracking down on safety through contract enforcement or termination, mid tier and possibly even general contractors would be better advised to simply eliminate any reference to safety in their subcontracts. *See IBP, Inc. v. Herman*, 144 F.3d at 867. The Commission signaled its concern about boilerplate contract terms referencing safety in *Evergreen Constr. Co.*, 26 BNA OSHC 1615 (No. 12-2385, 2017). Commissioner MacDougal noted that OSHA's rationale would raise even a controlling employer's duty to exercise reasonable diligence to an unreasonable level.[1] If the Secretary's theory is accepted, a general contractor would be better off not having an onsite supervisor in charge of safety inspecting the worksite, "lest the supervisor discover a subcontractor out of compliance and actually take action." *Evergreen Constr. Co.*, 26 BNA OSHC 1615 (No. 12-2385, 2017). "By discovering and addressing noncompliance, a general contractor's obligation

---

[1]Because of a vacancy on the Commission, only two Commission members participated in *Evergreen*. Their conflicting and offsetting opinions resulted in the Hearing judge's decision becoming the final order of the Commission.

to monitor and inspect is not lauded; it inexplicably grows." *Id.*

At least Evergreen was a general contractor. Where as here, Fama, the only cited employer is merely a mid tier subcontractor, the Secretary's logic is further strained. The ability to prevent or abate a hazardous condition through the exercise of supervisory authority is not reasonable if it requires a subcontractor such as Fama to incur the added expense of site monitoring by a supervisor if that expense would cost the mid tier subcontractor the bid for the homebuilder project. It becomes economically infeasible. *See Discussion in Section XI.D., infra.* Applying a contract clause discussing safety requirements to create controlling employer liability does not advance a reasonable definition of controlling employer. The result is at cross purposes to the OSH Act. The multiemployer policy should not encourage ostrich-employers whose only means of escaping OSHA liability is to sever any vestige of responsibility for compliance with the Act. *IBP, Inc. v. Herman*, 144 F.3d at 867.

2.     *OSHA's Selective Enforcement of its Multiemployer Citation Policy Is Arbitrary and Unreasonable.*

OSHA applies its multiemployer policy arbitrarily rather than uniformly and consistently as required by the A.P.A. OSHA selects some employers for citation at multiemployer sites, but not others, without stating a clear basis for how OSHA chooses among them. For example, at the jobsite at issue here, OSHA only cited Fama, an employer with no jobsite presence. OSHA did not cite either the creating

and exposing labor subcontractor employer who was continuously on site and monitoring its laborers, or the homebuilder general contractor who has general supervisory authority over the jobsite, and is often present at the jobsite with regular consistency.

OSHA's unbridled discretion makes no distinction on construction sites between general contractors and mid tier or lower tier employers who, simply based on their status as parties to a contractual relationship with the creating or exposing employers are swept into OSHA's ambiguous definition of a controlling employer. There is no consideration of whether these lower tier employers are actually in control of the jobsite; or whether they are in the best position to correct hazards; or even whether they are ever present at the jobsite.

By its failure to provide unambiguous guidelines, OSHA essentially imposes strict liability on employers that it arbitrarily deems to be controlling employers. Through shifting changes to its definition of controlling employer after 1981, OSHA redefined control in an irrational way to stack the deck in its favor, citing employers such as Fama, who lack real control as the term is commonly understood at construction sites. OSHA's multiemployer policy must clearly and carefully define those employers who could be subject to liability, and under what circumstances. *Georgia Pacific Corp.*, 25 F.3d at 1005. ("The Secretary, as enforcer of the Act, must state with ascertainable certainty what is meant by the promulgated standards.").

19

C.    **Application of OSHA's Multiemployer Policy Should Be
Limited to General or Other Contractors with Actual Onsite
Control over the Jobsite, and Not Applicable to Mid-Tier
Subcontractors Lacking Actual Onsite Control over the Jobsite.**

Proof that Fama was a controlling employer is an essential element of the
Secretary's *prima facie* burden. Unambiguous evidence of Fama's supervisory
capacity or control over the worksite is required, and the Secretary has the burden
of proof. *IBP, Inc. v. Herman*, 144 F.3d 861 (D.C. Cir. 1998). Relying exclusively on the
*ipse dixit* of OSHA's multiemployer policy, OSHA's designation of Fama as a
controlling employer is vague, ambiguous and arbitrary, and therefore improper.

The Secretary never contended that Fama was the general contractor. An
employer who is not a general contractor should be less likely to meet a reasonable
definition of controlling employer because it has limited, if any practical supervisory
responsibility over the jobsite. As a mid tier subcontractor to the homebuilder
general contractor, Fama did not have general supervisory authority over the
worksite, and was not the employer in the best position to correct the hazard or
assure its correction. An employer in Fama's role, with no practical supervisory
capacity, should almost never be liable as a controlling employer.

None of the authorities relied upon by the Secretary in its prior briefings
before the Commission to show that Fama was a controlling employer are persua-
sive. All involved either the project general contractor, or a mid tier subcontractor

with supervisory employees working at the site, or in limited circumstances with tradesmen. All are clearly distinguishable from Fama. In *McDevitt Street Bovis, Inc.*, 19 BNA OSHC 1108 (OSHRC 97-1918, 2000), controlling employer McDevitt was the general contractor for its project with twenty two employees onsite, including two assistant project superintendents and a project manager. McDevitt employees performed some of the work in addition to McDevitt's role as general contractor. In *Anning-Johnson*, 4 BNA OSHC 1193 (No. 3694, 1976)], controlling employer Anning-Johnson employed four employees at the project. In *Grossman Steel*, 4 BNA OSHC 1185 (No. 12775, 1976)), Grossman Steel's own employees were actively working the site. Centex-Rooney [*Centex-Rooney* 16 BNA OSHC 2127 (No. 92-0851, 1994)] was another general contractor with active employees working the jobsite. Haugan Construction Company [*Gil Haugan d/b/a Haugan Constr. Co.*, 7 BNA OSHC 2004 (No. 76-1512, 1979)] was also the general contractor on the site of its Citation. Although not at the site during OSHA's Inspection, Haugan's workers were present at other times throughout the project. Summit [*Summit Contractors Inc.*, 22 BNA OSHC 1777, 1781 (No. 03-1622, 2009)] presented a general contractor who had subcontracted its entire project, as had Fama although only in Fama's capacity as a mid-tier subcontractor. Although no Summit employees were on hand during OSHA's Inspection, liability was predicated on a Summit project superintendent and three assistant superintendents regularly supervising the worksite.

21

In its later briefings before the Commission, the Secretary relied on *NDC Construction Co. v. Sec. of Labor*, No. 20-14484, 2022 WL 2373402 (11th Cir. June 30, 2022); *NDC Construction Company*, OSHA Docket No. 17-1689, 2020 and *Stormforce of Jacksonville, LLC*, OSHA Docket No. 19-0593, 2021. Neither decision is controlling or persuasive. First and foremost, in contrast to Fama, both NDC and StormForce were general contractors with clear and significant direct oversight over their jobsites, sufficiently establishing their liability as controlling employers. NDC managed its entire construction worksite. It had employees on site directing the construction process and overseeing all of the subcontractors, and performed daily worksite walkthroughs. On its jobsite, StormForce was responsible for scheduling, overseeing logistics, and inspecting and approving the work of its subcontractors. It assigned a single foreman for each roofing job who was expected to be there every day, and was responsible for managing the subcontractor's crew, and inspecting the work at several stages of the job. StormForce expected its site foreman to ensure that the labor subcontractor had fall protection equipment and was using it. He, and therefore StormForce, had actual notice of the absence of fall protection that resulted in the citations at issue, having observed and photographed it.

Fama's contracts with its subcontractors required the labor subcontractors to assume the responsibility for complying with OSHA standards. *See e.g.,* Ortega Contract, Secretary's Exhibit G, pp 3-6 ("Subcontractor . . . has the sole responsibility

22

for compliance with all of the requirements of the Occupational Safety and Health Act"). These contracts gave Fama no practical or effective control over safety, nor broad responsibility over the roofing sites. Fama's contractual authority lacks the requisite control to encompass Fama's responsibility for worksite safety as a controlling employer. Nothing in Fama's relationship to its labor subcontractors establishes the level of control required to classify it as a controlling employer.

Fama's occasional visits to worksites and alerting subcontractors to hazards noticed by happenstance in an effort to get them to comply with their safety obligations is not evidence of worksite control. Quite the opposite. The contracts instead confirm Fama's disavowal of micromanagement, a practice favorably and approvingly noted in *IBP, Inc. v. Herman*, 144 F.3d at 867 ("the Company did not assume responsibility for safety control by sending three employees to perform quality control."). As with IBP, that was the most Fama could have been expected to do. *See also David Weekley Homes*, 19 BNA OSHC 1116, 1119 (No. 96-0898, 2000) (vacating citation where David Weekley Homes, even though it was the general contractor, had limited onsite presence and the Secretary conceded that the general contractor had discretion over how frequently to inspect).

Nor is the Secretary's highlighting of Fama's mandatory safety training requirements and a written safety program any more probative of the contracting parties' relationship than that of the parties to any construction contract. Safety

23

obligations are customarily written into all construction contracts with safety requirements imposed down the chain from owners to general contractors through mid and lower tier subcontractors, *i.e.*, boilerplate flowdown contract clauses.

Fama is clearly not a controlling employer. Contrary to the inapplicable authorities relied upon by the Secretary, Fama's role is nearly identical to that of IBP, Inc., which should be the controlling authority here rejecting the Secretary's attempt to classify Fama as a controlling employer. *IBP, Inc. v. Herman*, 144 F.3d at 867.

The labor subcontractors who hired and supervised the workers at the jobsite, were in the best, if not the only position to enforce workplace safety, but here they suffered no consequence because OSHA arbitrarily failed to cite them. They can peddle their labor contract services to other roofing projects where they continue their unsafe practices apparently without the risk of enforcement action.

D.  **The Review Commission's Findings That Fama Failed to Support its Economic Infeasibility Claim Was Arbitrary and Contrary to Established Law.**

OSHA demands that Fama hire supervisors to monitor the work of its labor subcontractors. The cost to Fama of complying with OSHA's demands are economically infeasible. An economic feasibility argument must demonstrate that it is extremely costly for the employer to comply with the standard, and that the employer cannot absorb the cost and remain in business. *M.C. Dean, Inc. v. Secretary of Labor*, 505 Fed.Appx. 929 (11th Cir. 2013). Fama doesn't have on site supervisors,

24

and can't afford the cost of full time supervision of the labor subcontractor and its workers. Declaration of Francisco Martinez, OSHRC Docket Exhibit "A" at ¶¶6-10.

Fama is a small company that competes with other small companies in bids to secure roofing labor and materials contracts from client homebuilders. Declaration of Francisco Martinez, OSHRC Docket Exhibit "A" at ¶4. Fama is typical in the roofing industry where small concerns lack the ability to absorb significant capital outlays, and have even less ability to spread these expenditures among its client homebuilders in the form of an increased bid for the job. Declaration of Francisco Martinez, OSHRC Docket Exhibit "A" at ¶¶4, 10.

Fama would have to factor the added cost of hired supervisors to its bid for roofing work from the homebuilder clients on whom Fama is dependent for contracts. Declaration of Francisco Martinez, OSHRC Docket Exhibit "A" at ¶¶6-10. The cost of hiring a competent employee to supervise the work of labor subcontractors is at least $50,000. Declaration of Francisco Martinez, OSHRC Docket Exhibit "A" at ¶6. In the current labor shortage environment, the cost is very likely much more. *Id*. Payroll taxes and insurance and third party payroll administration add to the costs that comprise the full cost of employee compensation. Declaration of Francisco Martinez, OSHRC Docket Exhibit "A" at ¶6.

As the Fama tax returns for the three most recent years show, the $50,000 minimum cost exceeds the profit of Fama in every year, and substantially so in most

years. Forms 1120S for 2017, 2018 and 2019, OSHRC Docket Exhibits "B", "C" and "D". Fama therefore lacks the minimum ability to absorb the significant capital outlay of hiring employees to be present at the jobsite supervising the work of labor subcontractors. *See e.g., M.C. Dean, Inc. v. Secretary of Labor*, 505 Fed.Appx. 929 (11th Cir. 2013).

Fama cannot spread the added costs of hired supervisors among its homebuilder clients in the form of price increases without causing it to lose its bid for the homebuilder contracts — an obviously severe adverse economic consequence for Fama. The added cost is not economically feasible. If Fama gets no contracts, it goes out of business. *Id.*

1. *The ALJ Wrongly Determined That Fama Failed to Offer Proof of a Feasible Alternative Means of Protection*

In his subsequent decision following remand by the Commission, the ALJ cited a Commission precedent that to establish an infeasibility defense, Fama "must prove: (1) means of compliance prescribed by the standard are technologically or economically infeasible, and (2) there are no feasible alternative means of protection." *Centimark Corp.*, No. 20-0762, 2023 WL 2783505, at *21 (OSHC Mar. 29, 2023). Based on this precedent, the ALJ determined that although Fama did offer evidence regarding the first element of Fama's infeasibility defense — economic infeasibility, it was "rendered immaterial by Fama's complete failure of proof concerning the

second element of its case." ALJ at p4. The ALJ determination became the final decision of the Commission when the Commission declined to review the latest ALJ decision. The application of this precedent by the ALJ was wrong.

There are many Commission decisions involving infeasibility, but few appear to turn solely on economic infeasibility. Most involve technical infeasibility, *i.e.*, other practical means by which the employer could have eliminated the hazard. Decisions based on economic infeasibility are effectively judged by a different standard. Decisions limited to economic infeasibility do not cite the two part test highlighted in the ALJ decision here. *See, e.g. M.C. Dean v. Sec'y of Labor*, 505 Fed. Appx. 929 (11th Cir. 2013); *Color Pigments Mfrs. Ass'n, Inc. v. Occupational Safety & Health Admin*, 16 F.3d 1157 (11th Cir. 1994); *Harry C. Crooker & Sons, Inc. v. Occupational Safety & Health Review Comm'n*, 537 F.3d 79, 82 (1st Cir. 2008). The reason why the two part test is not cited is likely because by encompassing technical alternative means in the economic infeasibility argument, the employer satisfactorily demonstrates that the cost of compliance with the technical alternative is unaffordable.

To prove economic infeasibility, an employer must show that the technical alternative means "would have had a severe adverse economic effect on the company." *M.C. Dean v. Sec'y of Labor*, 505 Fed. Appx. at 937. The economic infeasibility decisions are not sufficiently clear in distinguishing between economic and technical infeasibility. This Court should clarify that in economic infeasibility

27

cases, an employer is not required to specifically enumerate alternative means if the employer establishes that otherwise apparent means are economically infeasible.

No magic words or special incantations are required to properly present evidence as to feasible alternative means of protection. Fama does not need to specifically state "these are alternative means of protection", followed by a list of alternative means. Requiring an employer to specifically identify technically compliant alternatives is an unnecessary redundant exercise if the employer has already identified and considered those means in its economic argument.

> 2.  *Contrary to the ALJ Finding, Fama Did Offer Evidence*
>     *of Proof Concerning the Second Element of its Case*

Fama's discussion of the cost of hiring an additional supervisor adequately described at least one feasible alternative means of protection, *e.g.*, hiring a supervisor. In arguing that the cost of doing so would be prohibitive, Fama represents that hired supervision was a feasible alternative means of promoting fall protection. The ALJ acknowledged as much in his finding that "Fama asserts compliance with the cited provisions would require it to hire an additional supervisor at a cost of $50,000 per year, an amount it claims would cause it to go out of business. (Resp't's Mem. Resp. to Sec'y's Renewed Mot. Summ. J. 15-17; Martinez Decl. ¶6; Exs. B-D.)" ALJ at p4. But the ALJ failed to recognize that Fama's cost arguments as to the expense of hired supervision was the very evidence that the ALJ determined was lacking.

**E.    The Review Commission Findings That Fama Can Be Held Responsible for the Violative Conditions at the Worksites Are Not Supported by Substantial Evidence.**

    *1.    Nothing in Fama's Relationship to its Labor Subcontractors Establishes the Level of Control Required to Classify it as a Controlling Employer.*

OSHA's multiemployer policy acknowledges that "the extent of the measures that a controlling employer must take to satisfy its duty to exercise reasonable care to prevent and detect violations is less than what is required of an employer with respect to his own employees" (CPL 02-00-124 - CPL 2-0.124 at ¶13). Even as applied to general contractors, case law recognizes the enforcement limitation that a "general contractor's duty to detect violations depends on what measures are commensurate with its degree of supervisory capacity." *Summit Contractors, Inc.*, No. 05-0839, (O.S.H.R.C., Aug. 19, 2010). The more an employer supervises or engages in the safety of its subcontractor, *i.e.* exercises control, the more responsibility (and potential liability) would logically be imposed by OSHA on the higher tier employer as the supervisor of its subcontractor's compliance with workplace safety rules.

The Secretary never contended that Fama was the general contractor. An employer who is not a general contractor should be even less likely to meet a reasonable definition of controlling employer because it has limited, if any practical supervisory responsibility over the jobsite. As a mid tier subcontractor to the homebuilder general contractor, Fama did not have supervisory authority over the

worksite, and was not the employer in the best position to correct the hazard or assure its correction. An employer in Fama's role, with no practical supervisory capacity, should almost never be liable as a controlling employer.

Fama lacked any real control as the term is commonly understood and applied at construction sites. Fama did not create or control the fall protection hazard, and with no employees at the worksite, lacked knowledge of the fall protection hazards in place. OSHA did not cite the labor subcontractor who was continuously on site supervising and working with its employees who failed to use adequate fall protection. If OSHA lacked the evidence to cite the creating and/or exposing labor subcontractor employer, then OSHA could not have had sufficient evidence to cite any other employer.

    2.    *The Labor Subcontract Gave Fama No Specific Rights To Control Safety.*

The Secretary contends that Fama's contract with the labor subcontractor empowered it to enforce fall protection, either by itself, or by pressuring the labor subcontractor. But Fama's labor subcontract assigned all safety obligations to the subcontractors who would be performing the work. Mid-tier subcontractor Fama's contracts with its subcontractors required the labor subcontractors to assume the responsibility for complying with OSHA standards. See e.g., Ortega Contract, Secretary's Exhibit G, pp 3-6 ("Subcontractor . . . has the sole responsibility for

compliance with all of the requirements of the Occupational Safety and Health Act"). These contracts gave Fama no practical or effective control over safety, nor broad responsibility over the roofing sites.

Fama's occasional visits to worksites and alerting subcontractors to hazards noticed by happenstance in an effort to get them to comply with their safety obligations is not evidence of worksite control. *IBP, Inc. v. Herman*, 144 F.3d at 867. Fama's contractual authority lacks the requisite control to encompass Fama's responsibility for worksite safety as a controlling employer.

Nor is the Secretary's highlighting of Fama's mandatory safety training requirements and a written safety program any more probative of the contracting parties' relationship than that of the parties to any construction contract. Safety obligations are customarily written into all construction contracts imposing safety requirements on those employers whose workers are performing the job tasks.

3.   *The Cost to Fama of Complying with OSHA's Demands Are Economically Infeasible.*

The ability to prevent or abate a hazardous condition through the exercise of supervisory authority is not reasonable if it requires a mid tier subcontractor such as Fama to incur the added expense of site monitoring by a supervisor if that expense would cost the mid tier subcontractor the bid for the homebuilder project.

Fama doesn't have the full time supervision of the subcontractor's laborers

that would be required to control them, and had no obligation to staff the job with its own supervisory employees. Fama would have to factor the added cost of hired supervisors to its bid for roofing work from the homebuilder clients from on whom Fama is dependent for contracts— a severe adverse economic effect on Fama. Fama can't afford the full time supervision of the laborers that would be required to control them without causing it to lose the homebuilder contracts. Declaration of Francisco Martinez, OSHRC Docket Exhibit "A" at ¶¶6-10. The Fama tax returns for 2017, 2018 and 2019 show that an additional $50,000 expense exceeds the profit of Fama in those years. Fama therefore lacks the minimum ability to absorb the significant capital outlay of hiring employees to be present at the jobsite supervising the work of labor subcontractors. See *M.C. Dean, Inc. v. Secretary of Labor*, 505 Fed.Appx. 929 (11th Cir. 2013).

## XII. CONCLUSION

The Petition for Review should be granted, and the citations vacated as not in accordance with applicable law, and not supported by the evidence.

Respectfully submitted January 15, 2024.

                                    _____s/ Andrew N. Gross_____
                                    **Andrew N. Gross**
                                    Georgia Bar No. 313450

**ANDREW N. GROSS, LLC**
*Counsel for Petitioner Fama Construction, LLC*
Suite 100, 1201 Peachtree Street, NE
Atlanta, Georgia 30361
(404) 877-9196

# UNITED STATES COURT OF APPEALS
## ELEVENTH CIRCUIT

**Fama Construction, LLC,**
            *Petitioner*,

   v.

**Secretary of Labor** ,
**United States Department of Labor,**
            *Respondent.*

Docket No. 23-12346

## CERTIFICATE OF SERVICE

I certify that I have served a true and correct copies of the Brief for the Petitioner with the Clerk of Court using the CM/ECF system to send email notification of the filing to:

Amy Tryon, Attorney
U.S. Dept. of Labor, Office of the Solicitor
200 Constitution Ave., NW, Suite S4004
Washington, D.C. 20210
tryon.amy.s@dol.gov

January 15, 2024

            _____s/Andrew N. Gross\_\_\_\_
            Andrew N. Gross
            Georgia Bar No. 313450

**ANDREW N. GROSS, LLC**
Suite 100
1201 Peachtree Street, NE
Atlanta, Georgia 30361
(404) 877-9196